IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN MULLARKEY, JR., )
    Petitioner, )
)
    v. ) 2:16-CV-1658
)
ERIC TICE, et al., )
    Respondents. )

MEMORANDUM and ORDER

John Mullarkey Jr., by his counsel has submitted a petition for a writ of habeas corpus. For the reasons set forth below, the petition (ECF No.1) will be dismissed, and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability will be denied.

Mullarkey is presently serving a life sentence imposed on June 29, 2009 following his conviction by a jury of first degree murder.(Petition at p.3). An appeal to the Superior Court was filed in which the questions presented were:

> Whether the trial court erred in failing to instruct the jury on voluntary manslaughter where there was evidence that the killing was a product of the heat of passion?
>
> Whether the trial court erred in failing to grant a continuance or mistrial at the close of all evidence where newly discovered evidence available first on that day that would have discredited the Commonwealth's chief rebuttal witness?
>
> Whether the trial court erred in admitting the photographs Commonwealth Exhibit 4, a photo of the deceased that was inflammatory, gruesome and the probative value was outweighed by its prejudice? (Answer, Exhibit 4 at p.3).

On August 10, 2011 the judgment of sentence was affirmed (Answer Ex. 5), and allowance of appeal was denied by the Pennsylvania Supreme Court on February 15, 2012 (Answer Ex. 6 at p.3).

A post-conviction petition was filed on February 13, 2013 and denied on September 4, 2014. An appeal to the Superior Court was filed in which the issue presented was "whether the trial court erred by denying/dismissing appellant's petition for post-conviction collateral relief without a hearing?" (Answer Exhibit 10 p.2). However, the individual allegations in support of this claim were:

I. Trial counsel was ineffective for failing to move to suppress statements made by the appellant while the appellant was in the hospital and/or for failing to request a jury instruction on the voluntariness of the statements. (p.25) [1]
II. Trial counsel was ineffective for failing to object to statements made by the prosecutor during closing argument (p.32)
III. Trial counsel was ineffective for failing to present evidence of the character of the victim and the nature of the victim's relationship with the appellant such to establish "adequate provocation" to merit a jury instruction on voluntary manslaughter… (p.36).
IV. Trial counsel was ineffective for failing to secure a proper witness to testify as to the severe psychological side effects of the prescription drug Accutane P.39).
V. Trial counsel was ineffective for failing to present an expert witness to testify to the nature of the wounds sustained by the victim and the petitioner and the conclusions and inferences that could be drawn therefrom and/or failing to effectively cross-examine the Commonwealth's expert witness, Dr. Todd Luckasevic (p.43).
VI. Trial counsel was ineffective for failing to investigate and secure a proper expert witness to conduct a multiaxial evaluation of the appellant and to present evidence regarding an Axis II diagnosis of the appellant (p.46).
VII. Trial counsel was ineffective for failing to present character witnesses (p.50).
VIII. Trial counsel was ineffective for failing to present evidence that the appellant was known to carry the knife used to perpetrate the killing on a regular basis (p.52).
IX. Trial counsel was ineffective for failing to present evidence of the tumultuous relationship between the victim and the appellant (p.53).

On November 16, 2015 the denial of post-conviction relief was affirmed (Answer Exhibit 11). Allowance of appeal to the Pennsylvania Supreme Court was denied on August 3, 2016 (Answer Exhibit 12).

In the instant counseled petition filed on November 1, 2016, Mullarkey raises the following issues:

---

[1] Page numbers refer to the petitioner's post-conviction appeal arguments located in Ex.10 to the answer at the designated pages.

I. Trial counsel was ineffective for failing to investigate the circumstances in which the petitioner told a police detective: (1) "If I did something …If someone did something wrong and they were on medication that made them do it, can they still be found guilty?" (2) "The coroner was wrong when he said she had 16 stab wounds. It was more like 2 times… [or] … 3"; "How can someone still be alive to say who stabled them if they were stabbed 16 times?" and (4) "The coroner was wrong when the [sic] stated the size of the knife that was used to stab [the victim] … the knife was 3.5 inches and not what the coroner said it was," while petitioner was in custody in the hospital and being treated for a laceration on his neck from which he nearly died of exsanguination.

II. Trial counsel was ineffective for failing to file a motion to suppress statements made by the petitioner to a detective while the petitioner was in the hospital based on a violation of the petitioner's Sixth Amendment rights pursuant to Massiah v. United States, 377 U.S. 201 (1964) i.e. because the plainclothes detective continued to interrogate the petitioner after having been notified that petitioner was represented by counsel.

III. Trial counsel was ineffective for failing to file a motion to suppress statements made by the petitioner to a detective while the petitioner was in the hospital pursuant to Miranda v. Arizona, 384 U.S. 466 (1966).

IV. Trial counsel was ineffective for failing to file a motion to suppress statements made by the petitioner to a detective while the petitioner was in the hospital on the basis that the statements were not voluntarily made.

V. Trial counsel was ineffective for failing to object to statements made by the prosecutor during closing arguments.

VI. Trial counsel was ineffective for failing to present evidence via cross-examination or defense witnesses regarding the nature of the relationship between the petitioner and the victim. Alternatively, the trial court erred by failing to instruct the jury on voluntary manslaughter when sufficient evidence had been presented over the course of the trial to support the charge.

VII. Trial counsel was ineffective for failing to present proper expert testimony regarding the prescription drug Accutane.

VIII. The trial court erred by failing to grant a mistrial/continuance when, after the close of the defense's case, but before closing arguments, new evidence that Accutane had been removed from the market had been discovered; alternatively, the state appellate court(s) erred by failing to grant a new trial on this basis.

IX. Trial counsel was ineffective for failing to present a forensic pathologist to testify to the nature of the wounds sustained by the victim and the petitioner, and the inferences that can be drawn therefrom.

X. Trial counsel was ineffective for failing to secure a proper psychological/psychiatric expert witness to conduct a multiaxial evaluation of the petitioner and to testify as to the findings therefrom, particularly regarding the presence and impact of any Axis II diagnosis up to and at the time of the killing.

XI. Trial counsel was ineffective for failing to present character witnesses on behalf of the petitioner.

XII. Trial counsel was ineffective for failing to present witnesses or to cross-examine witnesses to show that the petitioner regularly carried the knife used to perpetrate the killing with him in order to rebut the Commonwealth's allegation of premeditation.

XIII. Trial counsel was ineffective for failing to file a motion to suppress evidence seized from the petitioner's cell phone.

XIV. The petitioner was deprived of his Constitutional right to trial by a fair and impartial jury because one of the jurors knew a family member of the petitioner and was biased against the petitioner's family as a result and trial counsel was ineffective for failing to strike the juror from the jury panel.[2]

The factual background to this prosecution is set forth in the November 16, 2015 Memorandum of the Superior Court:

> Appellant and the victim, sixteen-year-old Demi C., were involved in an intermittent romantic relationship. Attempting to rekindle his relationship with the victim, Appellant continually text-messaged her over a period of days. During this time, Appellant displayed signs of depression to his close friend Greg B., who was also a neighbor of the victim. After learning that the victim and a male friend of hers were spending time together at her home, Appellant threatened to use a screwdriver to break the windows of her friend's car. On the date of the murder, Appellant and the victim text-messaged one another throughout the day before Appellant travelled to the victim's home. Prior to proceeding to the victim's residence, Appellant asked the victim if her older brother, who was also a friend, was home. The victim informed Appellant that her brother was not at the house. Before leaving for the victim's residence, Appellant told Greg B that the victim told him that he could not hug or kiss her. Appellant asked his friend if he should still go and see the victim. Greg B. advised Appellant that there was no reason to

---

[2] The Commonwealth concedes that the instant petition is timely (Answer at p.13).

see her, but Appellant decided that he had to talk with the victim. Appellant then stated to Greg B. that he hoped that he did not do anything stupid.

Meanwhile, Gale S., one of the victim's neighbors, walked to her daughter and son-in-law's house, which was next door to the victim's residence. While conversing, the three individuals heard blood-curdling screams coming from next door. Demi C. then exited her home covered in blood, staggered over to Gale S., and said that Appellant stabbed her. The victim and Gale S. collapsed onto the ground, as Gale S's son-in-law telephoned 911. While attempting to reach 911, he saw Appellant approach. Appellant appeared to be on a cellular phone and tossed the telephone to him before falling to the ground. In an attempt to commit suicide, Appellant had sever[ely] cut his own throat, causing a gaping wound from ear to ear.

Police, paramedics, and EMT's [sic] arrived shortly thereafter. Initially, Appellant's injuries were considered more serious and police directed the first paramedics to arrive on the scene to treat him first. Appellant was rushed to a hospital where his life was saved. The second paramedic to arrive immediately began life saving measures on the victim; despite these efforts, the victim died. She suffered a total of sixteen stab wounds from a three-and-one-half-inch pocket knife owned by Appellant. Several wounds were the length of the entire blade of the knife.

While under armed guard at the hospital, Appellant's ability to communicate was initially limited to writing statements on a dry erase board. At one juncture, Appellant questioned the officer guarding him whether a person could still be found guilty if that person did something wrong when he was on medication that made that person do it. Appellant added that he had been taking Accutane, a prescription medication designed to combat severe acne, which he alleged caused suicidal thoughts and violent outbursts. In addition, Appellant indicated to the officer that he stabbed the victim two or three times, not sixteen as reported.

The Commonwealth charged Appellant with criminal homicide. Appellant proceeded to a jury trial, asserting as a defense diminished capacity. In support of his position, he contended that his use of the prescription drug Accutane caused uncontrollable and aggressive actions. Both Appellant and the Commonwealth called expert witnesses. The expert testimony largely consisted of a discussion of Appellant's depression and whether Accutane could have caused him to stab the victim sixteen times. At the close of the evidence, but prior to the jury receiving its instructions, the manufacturer of Accutane removed it from the market. Appellant requested the trial court to either instruct the jury on this action, permit him a continuance to investigate, or declare a mistrial. The court denied these requests and the jury returned a guilty verdict and Appellant received the mandatory sentence of life imprisonment (Answer Exhibit 11 at pp.1-3).

In seeking relief here, Mullarkey asserts thirteen contentions that he was denied the effective assistance of trial counsel and finally in his fourteenth issue that he was denied trial before a fair and impartial jury.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court explained that there are two components to demonstrating a violation of the right to the effective assistance of counsel. First, the petitioner must show that counsel's performance was deficient. This requires showing that "counsel's representation fell below an objective standard of reasonableness." Id. at 688; see also Williams v. Taylor, 529 U.S. 362, 390-91 (2000). Second, under Strickland, the defendant must show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. To establish prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The Strickland test is conjunctive and a habeas petitioner must establish both the deficiency in performance prong and the prejudice prong. See Strickland, 466 U.S. at 687; Rainey v. Varner, 603 F.3d 189,197 (3d Cir.2010) cert. denied 131 S.Ct. 1673 (2011). As a result, if a petitioner fails on either prong, he loses. Rolan v. Vaughn, 445 F.3d 671 (3d Cir.2006).

The petitioner's first four allegations raise issues of ineffectiveness regarding failing to move to suppress petitioner's inquiry to the police while he was hospitalized and failing to move to suppress the ensuing statements, including his statements regarding the findings of the coroner.

While there is little doubt that the petitioner who was hospitalized as a result of his self-inflicted wounds was shackled to a bed and in police custody, the record also reflects that he was never interrogated but rather voluntarily asked questions of the guard.[3] Specifically, he tapped on the board to gain the officer's attention and inquired about the nature of a preliminary hearing (TT.265); about three hours later petitioner inquired whether if he did something, which he then modified to if someone did anything wrong and was on medication, could that person still be convicted (TT.266, 283-284);

---

[3] The petitioner was unable to speak and so wrote his inquiries on a dry erase board (TT. 264).

6

petitioner then related that he was on Accutane which was known "to cause suicidal thoughts and violent tendencies"(TT.267); that the television news reports frequently got the facts wrong (TT.268) including facts about him and the victim (TT.268); that the reports erroneously said his ex-girlfriend was fifteen years old and that he was nineteen (TT.268); that the coroner "was wrong when [he] stated the size of the knife that was used to stab Demi, and he went on to write that the knife was 3.5 inches and not what the coroner had said it was (TT.268); that the coroner was wrong when he said the victim had been stabbed 16 times and "it was more like two times" (TT.269, 284); that the criminal complaint had reported that the victim "told an ambulance driver that he had stabbed her, and he said, how can someone that was stabbed 16 times be alive to tell somebody who stabbed them" (TT.269, 284) and that the victim "drove him crazy and … ruined his relationship with his more current girlfriend" (TT.269, 278). On cross-examination the detective conceded that petitioner was "just trying to ask questions to understand his position as far as the legal process" (TT.273).

In reviewing this claim, the Superior Court cited the post-conviction court's finding that "Detective Kuma did not question Appellant. Appellant volunteered the information in question without any action by police likely to induce Appellant to write his statements."[4] Factual findings by the state courts are entitled to a presumption of correctness. 28 U.S.C. §2254(e)(1); Felkner v. Jackson, 131 S.Ct. 1305 (2011).

While the Court clearly held in Miranda v. Arizona, 384 U.S. 436 (1966) that the Fifth Amendment required certain safeguards be employed before a custodial interrogation can occur, the Court also held that,

> Confessions remain a proper element of law enforcement. Any statement *given freely and voluntarily without any compelling influences* is of course, admissible in evidence. (384 U.S. at 478)(emphasis added).

See: Rhode Island v. Innis, 446 U.S. 291, 300 (1980); Robertson v. Pichon, 849 F.3d 1173, 1184 (9th Cir. 2017).

In the present case, while Mullarkey was clearly in custody, there is also no doubt that he voluntarily initiated the exchange with the officer who never questioned him. Accordingly, these claims do not present a basis for relief under the Fifth Amendment. The petitioner also claims

---

[4] Exhibit 10 to the answer at p.10.

that counsel was ineffective by failing to allege that his Sixth Amendment right to counsel was violated by the police who did not advise him of this right during the hospital "interrogation". Since the record clearly demonstrates that an interrogation never occurred, counsel cannot be deemed to have been ineffective under the Sixth Amendment for failing to raise meritless arguments. Real v. Shannon, 600 F.3d 302, 310 (3d Cir. 2010).[5]

Petitioner next contends that counsel was ineffective for failing to object to the statements made in the prosecutor's opening and closing remarks. We observe that Dr. Wagner initially testified that "all drugs have issues where you should never go off cold turkey on these drugs". Whereas defense witness Dr. Wettstein testified that the petitioner had not reported any side effects from his discontinuation of Accutane, nor was he aware of any reports in the literature suggesting dire consequences of sudden termination.[6] In his closing, the prosecutor stated "folks, let me digress for a few minutes and talk about this boogeyman that's been conjured by in the openings and that Dr. Wagner tried to frighten you about. This cold turkey nonsense." (TT. 720- 721). The terms, "cold turkey" and sudden cessation were used interchangeably.

Specifically in his challenge to the prosecutor's arguments, petitioner points to his opening where he stated:

> Accutane, this pimple pill that Mr. Mullarkey was on for a total of
> four months and never had any problems with except that his pimples
> went away (TT.41),

and his closing,

---

[5] The record also demonstrates that the petitioner never made a showing that his statements were involuntary due to a drugged induced state. (Exhibit 11 to the answer at p. 10).

[6] Dr. Wagner, a defense witness who holds a Doctor of Pharmacy degree (TT. 403) which is not the equivalent of a Ph.D. in pharmacy (TT. 424), testified that Accutane had possible side effects of depression, psychosis and suicide (TT. 409). He testified that although he had no specific experience with Accutane "cold turkey" withdrawal from some drugs could possibly result in psychotic episodes, overwhelming depression, insomnia, rage and aggressive behavior (TT. 419-420, 438-439). He conceded that he had no experience nor was he aware of any studies dealing with "cold turkey" Accutane withdrawal or any linkage with homicide (TT. 440-442). Dr. Wettstein also testified for the defense that he was aware of "links between Accutane and depression and irritability" (TT. 464) and that he believed the petitioner was suffering from a cognitive impairment (TT. 467) although some of his actions immediately after the crime appeared to demonstrate cognitive ability (TT. 472). Dr. Wettstein also testified that the petitioner had related that he discontinued his Accutane two or three days prior to the homicide (TT. 488); that the records from his dermatologist reflected that he had not reported any side effects from the Accutane (TT. 490) and that the literatiure does not demonstrate any link between the use of Accutane and depression, suicide or homicide (TT. 492).

> let me digress for a few minutes and talk about this boogeyman that's been conjured up in the openings and that Dr. Wagner tried to frighten you about. This cold turkey nonsense …
>
> What do we know about Accutane? We know from Dr. Seraly who has treated approximately 3,000 patients with Accutane in 15 years that worldwide, of the in excess of 13 billion doses that have been given, out of the 12 million people that have received Accutane, 12 million in the last 27 years, how many incidents of suicide have they had? 146. Less than the suicide rate you would expect in that same age group in the general population…
>
> Both Dr. Wright and Dr. Seraly agreed with that statement that I read from Dr. Wettstein… [who] found no causal link because of a lack of studies…
>
> The people from AGH that saw him closest in time to this incident, what did they diagnose … an adjustment disorder. Accutane in and of itself, ladies and gentlemen, is not what this case is about… (TT.720-722).

Certainly the opening and closing referenced the petitioner's allegation that his acts where cause by Acutane, and represented reasonable comments on the evidence produced at trial. Such comments provide a basis for relief only where they so infected the trial as to create a due process violation. Parker v. Matthews, 132 S.Ct. 2148 (2012). Such clearly is not the case here. In addition, the court instructed the jury that arguments of counsel do not constitute evidence (TT.759). For these reasons the argument raised here is without merit.

Petitioner's next argument is that counsel was ineffective for failing to present evidence of the volatile relationship between him and the victim so as to warrant a jury instruction on voluntary manslaughter.[7] In rejecting this argument, the Superior Court wrote,

> The facts of this case that Appellant contends support serious provocation were that the victim had kissed another boy in front of him, lied to him about quitting cheerleading, flirted with someone on MySpace, socialized with another boy, told him that she was sick of him, and struck him while he was physically restraining her on the day of the killing… None of the actions allege by Appellant, even when combined, constitutes serious provocation and Appellant points to no case law that so hold.[8]

---

[7] 18 Pa.C.S.A. §2503(a)(1) provides that "a person who kills an individual without lawful justification commits voluntary manslaughter, if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed."
[8] Exhibit 11 to the answer at p.17.

9

The resolution of this matter was based on state law, and for this reason is not subject to review here, Swarthout v. Cooke, 131 S.Ct. 859 (2011), and counsel cannot be faulted for failing to raise a meritless issue. Real v. Shannon. 600 F.3d 302, 310 (3d Cir.2010).

Petitioner next argues that counsel was ineffective in failing to call an expert witness to testify about the severe psychological effects of Accutane. As observed above, petitioner called Dr. Wagner to testify that as a result of the use of Accutane, petitioner could not form the specific intent to kill. While he did testify that the possible side effects of Accutane intoxication included psychotic episodes, overwhelming depression, insomnia, rage and aggressive behavior, he was not asked the ultimate question of whether petitioner "was overwhelmed to the point of losing his sensibilities" but rather concentrated on the effects of sudden withdrawal.[9] Petitioner seeks to bolster his claim that trial counsel was inadequate for calling Dr. Wagner as an expert rather than another individual, i.e. Frederick W. Fochtman, Ph.D. to testify. In a report dated October 26, 2016, seven years after the trial, Fochtman wrote that

> Side effects of Accutane include psychiatric manifestations of depression and aggression as well as a myriad of other possible ones. These side effects are estimated to occur [infrequently]. It is not inconceivable that anyone at any time may experiences these side effects. John Mullarkey's actions that led to the death of Demi Cuccia and his own suicide attempt …are consistent with the documented side effects reports for [Accutane] therapy. In the absence of any other cause the side effects of his drug therapy would have contributed to his state of mind and resultant actions taken.[10]

While both doctors supported the possible infrequent side effects from the use of Accutane, neither one was able to state that petitioner's Accutane intoxication so overwhelmed him to reduce the degree of murder to a lesser degree of murder. See: Commonwealth v. Blakeney, 946 A.2d 645, 653 (Pa. 2006) ("Evidence of intoxication may be offered by a defendant to reduce murder from a higher degree to a lower degree.") 18 Pa.C.S. § 308.[11] Intoxication, however, may only reduce murder to a lower degree if the evidence shows that the defendant was "overwhelmed to the point of losing his faculties and

---

[9] See: Petition at p.65.
[10] See: Exhibit T to the petition.
[11] 18 Pa.C.S.A. §308 provides "neither voluntary intoxication nor voluntary drugged condition is a defense to a criminal charge, nor may evidence of such condition be introduced to negative the element of intent of the offense, except that *evidence of such intoxication or drugged condition of the defendant may be offered by the defendant whenever it is relevant to reduce murder from a higher degree to a lower degree of murder*"(emphasis added).

10

sensibilities." Commonwealth v. Breakiron, 524 Pa. 282, 571 A.2d 1035, 1041 (1990) (citation omitted), *cert. denied,* 498 U.S. 881, 111 S.Ct. 224, 112 L.Ed.2d 179 (1990)").

Thus, even if Dr. Fochtman had been called to testify, he was unable to provide any demonstration that the petitioner's sensibilities where "overwhelmed" by the use of Accutane, and for this reason counsel cannot be deemed to have been ineffective for failing to call him as a witness.

Petitioner also contends that the trial court erred when it failed to grant a mistrial/continuance when it was learned that Accutane had been removed from the market. At the close of testimony but prior to closing arguments and jury instructions, defense counsel moved for a continuance/mistrial based on "after discovered evidence on the withdrawal of Accutane" from the market (TT.675-677). Whereupon, the court relying on information contained in PharmaTimes related that "'Roche announced that it is withdrawing its acne drug Accutane from the U.S. market. The company has notified the U.S. Food and Drug Administration that it is pulling Accutane after a reevaluation of its portfolio revealed that the drug faces serious generic competition'"(TT. 678-679). Based on its conclusion that the decision to remove Accutane from the market was an economic decision, the court denied the motion (TT. 679). Or, as the Superior Court wrote in the direct appeal "the learned trial judge noted on the record that the reason given for removing the drug from the market was the result of the lack of profitability due to cheap generic competition" (Exhibit 5 to the answer at pp.10-11). State court findings of fact are presumed correct. 28 U.S.C. §2254(e)(1), and nothing in the record demonstrates a basis for concluding otherwise. Thus, this claim likewise is without merit.

Petitioner's next argument is that trial counsel was ineffective in failing to adequately cross-examine the prosecution's forensic pathologist, Dr. Todd Luckasevic, and also for failing to call Dr. Eric Lee Vey who is also a forensic pathologist (Exhibit 7 to the answer at Exhibit A) to testify as to the petitioner's state of mind ("the character and number of sharp force wounds to the homicide victim in this case, with their varying depths, orientations, and lengths… are supportive of a violent, maniacal, frenzied assault").

Petitioner argues that Dr. Luckasevic who is a board certified forensic pathologist (TT. 342), was not cross examined by defense counsel "regarding the inferences that could be drawn from these types of wounds in terms of the likely *mental* state of the attacker … [and] could have established that the killing occurred while the Petitioner was 'acting under a sudden and intense passion'") (petition at p.76)(emphasis added). There is nothing in the record to demonstrate that further cross-examination of Dr. Lickasevic would have supported petitioner's claim.

As to Dr. Vey the Superior Court wrote "Dr. Vey's expert report does nothing to show serious provocation nor … that Appellant's stabbing of the victim and himself were the result of such a mental defect that he could not formulate specific intent" (Exhibit 11 to the answer at p.21). In Saranchak v. Beard, 616 F.3d 292, 308 (3d Cir. 2010) , cert. denied 565 U.S. 831 (2011), the Court wrote "diminished capacity is 'an extremely limited defense' that requires a defendant to establish through *'extensive psychiatric testimony* [that he] suffered from one or more mental disorders which prevented him from formulating the specific intent to kill'" (citations omitted)(emphasis added). No such demonstrate is made here, and the petitioner's claims do not support relief.

Petitioner next contends that counsel was ineffective in failing to introduce expert psychological/psychiatric testimony. Specifically, petitioner contends that counsel was ineffective in failing to request his expert to provide a multi-axial diagnosis. That is the expert failed to evaluate the petitioner's cognitive function despite the fact that the petitioner had been "evaluated by a number of mental health professions" (petition at pp.81-84).[12]

In this regard, petitioner refers us to the report of a January 2013 examination by Dr. Ernest Boswell which was conducted 6 ½ years after the events. In that report Dr. Boswell concludes,

> It is the opinion of the current examiner that Mr. Mullarkey's actions were the result of a combination of serious provocation and underlying personality disorder with borderline features, which rendered him incapable of normal reflection between the time of the provocation and the actual assault. (Post-conviction petition Ex.M at p.24).

---

[12] Petitioner's expert witness reported that he "cannot state with reasonable psychiatric certainty that the defendant … completely lacked the cognitive ability to premeditate and deliberate the alleged offense" (petition at p.83).

12

In reviewing this claim, the Superior Court wrote,

> Although Dr. Boswell set forth that it was his opinion that Appellant's actions were "the result of serious provocation" and his personality disorder … the actual provocation discussed in Dr. Boswell's report was the victim's angry comments that she hated him and did not want to see him again. As a matter of [Pennsylvania] law, such words to not rise to the level of serious provocation. Hence, even if Dr. Boswell testified at trial, Appellant still would not have met the legal criteria for a heat of passion or diminished capacity defense (Exhibit 11 to the answer at pp.23-24).

Thus, as a matter of Pennsylvania law, even if Dr. Boswell's testimony at been presented at trial, if would have not lessened the offense level and counsel cannot be deemed to have been inadequate for failing to secure this testimony. Real v. Shannon, supra.

Petitioner next contends that counsel was ineffective in failing to call character witnesses including a priest and a police officer to testify on his behalf.

At trial and out of the presence of the jury but in the presence of the defendant, defense counsel represented that the petitioner was aware of his right to testify or remain silent, as well as to call character witnesses, and that he elected to do neither (TT.507-509). In reviewing this claim, the Superior Court wrote,

> Appellant's defense was not that he did not commit the crime. Instead, Appellant was seeking a finding of guilt that was lesser than first-degree murder. Contrary to Appellant's claim, evidence that Appellant had a peaceful character does not give rise to a legal inference that he was seriously provoked or suffering from voluntary intoxication because he was seriously provoked or suffering from voluntary intoxication because he stabbed the victim outside of that character. In order to establish a lesser culpability than first-degree murder, Appellant was required to provide evidence of serious provocation or that his taking of Accutane so impaired him that he was unable to form specific intent. The presentation of character evidence does not do either and would not have warranted a jury instruction relative to voluntary manslaughter. Appellant cannot establish actual prejudice (Ex.11 to the answer at p.26).

The record demonstrates that petitioner and his counsel had discussed the calling of character witnesses, and that neither concluded that their testimony was necessary. Additionally, as a matter of state law, the calling of those witnesses would not have provided a valid defense to first degree murder, and that counsel cannot be deemed to have been ineffective in failing to raise a meritless defense. Real v. Shannon, supra.

Petitioner next contends that he is entitled to relief as a result of counsel's inadequacy in failing to call or cross examine witnesses regarding the fact that the petitioner carried the knife involved in the homicide on a regular basis thereby permitting an inference that he did not premeditate the crime by the unusual act of carrying a knife. Petitioner argues that lack of such evidence permitted the jury to conclude that the petitioner purposefully brought the knife with him on the evening in question for the purpose of conducting a homicide (Petition at p. 94). Evidence in the form of testimony and an outstanding police report presented conflict on the petitioner's knife carrying propensity but had no relevance to the issue of premeditation and counsel cannot be deemed to have been ineffective for failing to call Jaccob Cuccia as a witness.[13]

The next issue raised is the alleged ineffectiveness of counsel for failing to move to suppress the text messages secured from the petitioner's cell phone without a warrant. In support of this claim, the petitioner relies on Riley v. California, 134 S.Ct. 2473, 2485 (2014)("officers must generally secure a warrant before conducting [a cell phone] search"). The problem with the claim of ineffectiveness is that Riley was decided five years after the petitioner's trial. For this reason counsel cannot be deemed ineffective for not raising a claim that did not exist at the time of trial. See: Chaidez v. United States, 133 S.Ct. 1103, 1111 (2013). Thus, this claim does not provide a basis for relief.

Petitioner's final issue that trial counsel was ineffective in failing to strike one of the jurors who knew a family member and was biased against the petitioner. The Sixth Amendment provides in part that "the accused shall enjoy the right to a …trial by an impartial jury…" "*[I]mpartiality,* we have reiterated, does not require *ignorance*." Skilling v. United States, 130 S.Ct. 2896, 2915 (2010).

Specifically, in this regard the petitioner contends that:

> One of the jurors, Anthony Panza… during jury selection/*voir dire* stated under oath that he did not know the Petitioner or anyone in the Petitioner's family. Information obtained since the Petitioner's trial has shown this to be false. In fact, Mr. Panza knew the Petitioner, John Joseph Mullarkey, Jr.'s cousin, John Michael Mullarkey.Mr.

---

[13] Of note is the fact that petitioner's friend was called as a prosecution witness and testified that he was unaware of the petitioner carrying a knife (TT.309-310). However, petitioner's father testified that his son regularly carried a knife (TT. 398-400). In addition, it is alleged that in a supplemental police report dated August 17, 2007, Jaccob Cuccia acknowledged that he had observed the petitioner with the knife on other occasions (ECF 13-5 pp.46-48).

14

> Panza went to Hampton High School with John Michael Mullarkey.
> In fact Mr. Panza had dated a young lady who then broke up with him
> and began dating John Michael Mullarkey.(Petitioner at p.99).

Petitioner now contends, without any support, that as a result of this conduct he was denied a trial before an impartial jury and counsel was ineffective in failing to remove Mr. Panza from the panel. This claim has never been raised in the state courts, can no longer be raised in those courts and for this reason is procedurally defaulted and need not be address here. Coleman v. Thompson, 501 U.S. 722,750 (1991).

However, even if properly preserved this claim fails for two reasons. First, there is no record support for it and there is no showing that this claim could not have been determined through the exercise of due diligence. 28 U.S.C. § 2254(e)(2)(A)(ii). Secondly, as noted above counsel cannot be deemed to have been ineffective for failing to raise an issue which was unknown at the time of trial. Chadiz, supra.

Accordingly, because the petitioner has failed to demonstrate that his conviction was secured in any manner contrary to federal law as determined by the Supreme Court nor that his conviction result from improper application of that law, he is not entitled to relief here. For this reason, the petition will be dismissed and because reasonable jurists could not conclude that a basis for relief exists, a certificate of appealability will be denied.

An appropriate Order will be entered.

ORDER

AND NOW, this 5th day of September, 2017 for the reasons set forth above, the petition of John Mullarkey, Jr (ECF No.1) is DISMISSED, and because reasonable jurists could not conclude that a basis for appeal exists, a certificate of appealability is DENIED.

s/ Robert C. Mitchell

United States Magistrate Judge